UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
GROCERY HAULERS, INC.,                  :
                    Plaintiff,          :
                                        :     11 Civ. 3130 (DLC)
        -v-                             :
                                        :     OPINION & ORDER
C & S WHOLESALE GROCERS, INC.,          :
                    Defendant.          :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:
William R. Fried
Stephen B. Selbst
Janice I. Goldberg
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016

For Defendant:
Dominic J. Picca
Benjamin L. Hincks
Benjamin B. Tymann
Michael J. Ticcioni
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Chrysler Center
666 Third Avenue, 25th Floor
New York, NY 10017

DENISE COTE, District Judge:

        Both parties in this case have moved for summary judgment.

Defendant C&S Wholesale Grocers, Inc. ("C&S"), a supply and

transportation business, has moved for partial summary judgment

against plaintiff Grocery Haulers, Inc. ("Grocery Haulers"), a

trucking company for food retailers, on C&S's counterclaims for

violation of 49 U.S.C. § 13708.  Grocery Haulers has moved for

summary judgment on its request for judgment declaring that C&S had no authority to terminate the parties' 2001 trucking agreement and on each of C&S's five counterclaims.  For the following reasons, C&S's motion for summary judgment is denied and Grocery Haulers' motion for summary judgment is granted in part.

BACKGROUND

The following facts are undisputed unless otherwise noted. Grocery Haulers, a Delaware corporation with its principal place of business in New Jersey, is in the business of providing trucking services for food retailers.  C&S is a Vermont corporation with its principal place of business in New Hampshire; it provides trucking, warehousing and supply services for food retailers.  On July 5, 2001, C&S and Grocery Haulers entered into an agreement (the "Trucking Agreement"), which was amended on September 7, 2001, January 1, 2003, and July 1, 2005, for the provision of certain motor carrier delivery services ("Trucking Services").[1]

Pursuant to the terms of this agreement, Grocery Haulers as the "Carrier" was to provide delivery services to C&S as the "Shipper" and owner of various products to Key Food Stores

---

[1] Grocery Haulers claims, and C&H disputes, that the Trucking Agreement was also amended on January 1, 2005.

Cooperative, Inc. ("Key Food"), a cooperative corporation whose members independently own supermarkets in New York City and the broader metropolitan area, as well as to other C&S customers. Under the Trucking Agreement, C&S agreed to pay Grocery Haulers an amount equal to Grocery Haulers' costs in performing its motor carrier delivery obligations, as well as "a management fee of $2,250,000 per Contract Year" as compensation for Trucking Services.

The parties disagree about the nature of Grocery Haulers' delivery obligations under the Trucking Agreement. C&S claims that the Trucking Agreement required Grocery Haulers, for purposes of this dispute, to deliver products to a specific set of Key Food stores (the "Key Food Stores" or "Listed Locations") only. C&S argues that these Listed Locations were designated in the agreement itself. Grocery Haulers contends that the Trucking Agreement contained no such requirement and, instead, permitted Grocery Haulers to follow the instructions of Key Food to deliver products to locations other than the Key Food Stores without obtaining permission from C&S.

At the direction of Key Food, Grocery Haulers delivered grocery and perishable products ordered by Key Food to destinations other than the Key Food Stores from January 2010 through approximately April 2011. Grocery Haulers made between 129 and approximately 150 such deliveries (the "Disputed

Deliveries") over this 16-month period.  Each Disputed Delivery
went to one of three locations: Bozzuto's, Inc.'s ("Buzzuto's")
warehouse in Cheshire, Connecticut; a warehouse in Kearny, New
Jersey ("Glenary Warehouse"); and Eden Farms in Forest Hills,
Queens ("Eden Farms") (collectively, the "Unlisted Locations").
97 Disputed Deliveries went to Bozzuto's, a competitor of C&S.
In all cases the re-routed goods were purchased from C&S by Key
Food, and then sold to the Unlisted Locations upon delivery.
Grocery Haulers CEO Mark Jacobson ("Jacobson") testified, and
C&S denies, that C&S "made it clear" to Grocery Haulers that
Grocery Haulers was to take its day-to-day instructions from Key
Food at the time the parties were negotiating the Trucking
Agreement.  According to the testimony of C&S executive Curt
Hansen ("Hansen"), however, C&S only became aware that Grocery
Haulers was making deliveries to locations other than the Key
Food Stores in October 2011.  Grocery Haulers does not contend
that it ever obtained explicit permission from C&S to deliver to
these locations.

        In all cases, the trip to the Unlisted Location was shorter
than the trip to the Key Food Store to which C&S alleges it
directed delivery.  Essentially, then, Key Food, Grocery
Haulers, and the Unlisted Locations were able to accomplish in
one shipment what otherwise would have taken two.  They were
able to shorten significantly total mileage associated with

4

transporting goods to the Unlisted Locations, decrease total loading and unloading costs, and ensure that C&S paid all the shipping costs associated with these deliveries.  Despite receiving delivery of goods purchased from Key Food, the Unlisted Locations did not pay C&S for shipping costs.

Grocery Haulers used a number of internal documents in connection with its provision of Trucking Services to C&S.  For each C&S delivery, the Grocery Haulers driver received a document from his or her superior, called a Daily Trip Sheet ("Trip Sheet"), which in all relevant cases listed a particular Key Food Store as the delivery location.  If Grocery Haulers opted to re-route the delivery, the driver would receive oral instructions from his or her superior to deliver the products elsewhere.  The Trip Sheets also included fields in which the drivers recorded by hand their supposed arrival time to, and departure time from, the delivery location, as well as total mileage and mileage by state.  For Disputed Deliveries, the Grocery Haulers drivers recorded their arrival and departure times to and from the Unlisted Locations even though the name and address of a Key Food Store appeared in the adjacent field marked "Location."  Although no Trip Sheets were ever presented to C&S for billing purposes, the Trucking Agreement gave C&S the right to demand an audit of Grocery Haulers' records, including the Trip Sheets.

Grocery Haulers also produced internal documents called "Daily Pay Reports" in connection with C&S deliveries in order to calculate its drivers' pay for a given day of work. Grocery Haulers transferred time and location data from the Trip Sheets to these Daily Pay Reports. Like the Trip Sheets, then, the Daily Pay Reports for Disputed Deliveries included "Location" fields with the names of Listed Locations instead of the Unlisted Locations where delivery actually took place.

One component of the driver's pay listed on the Daily Pay Report was called "Location Value." This was a designated dollar amount that the driver would receive for each delivery to a particular Listed Location. Generally speaking, the longer the trip, the higher the designated Location Value. Because there were no designated Location Values for the Unlisted Locations, however, Grocery Haulers would instead use the designated Location Value for the Key Food store that placed the order.

In addition, C&S provided Grocery Haulers with a Delivery Receipt Waybill ("Waybill") for each delivery, which Grocery Haulers would fill out and return to C&S following delivery. C&S contends, and Grocery Haulers disputes, that these Waybills constituted "bills of lading," or separate, enforceable contracts between the parties containing the details of a particular shipment. Each Waybill included a field marked

6

"Customer," filled in by C&S, which indicated the particular Key Food Store that had made the order, as well as identifying information about the types and quantities of products being shipped.  C&S contends that the "Customer" field indicated the Key Food Store to which the delivery was to be made; Grocery Haulers argues that it simply indicated who had placed the order.  The Waybills also contained a field marked "Store Receiver," with space for a signature, and a box marked "Received By/Store Stamp," with space for a stamp.

Even though the Disputed Deliveries were not actually made to Key Food Stores, Grocery Haulers has offered evidence that a Key Food employee or store manager (the "Key Food Representative") would be present to receive the shipment at the Unlisted Location and sign the line marked "Store Receiver" on the Waybill.  C&S contends that these signatures were forged so as to make it look like the delivery was made to the relevant Key Food Store.  C&S has introduced copies of Waybills where the signature does not appear to match the name of the Key Food Representative.  Grocery Haulers has admitted that on at least one occasion, the signature does not look like that of the Key Food Representative.

Upon delivery of a shipment to an Unlisted Location, the Key Food Representative typically would place a stamp in the Waybill's "Received By/Store Stamp" box with the name and

address of the Key Food Store, not the Unlisted Location where delivery had actually been made. Grocery Haulers has offered evidence that the Grocery Haulers driver would often wait at the delivery location for hours while Key Foods arranged the sale of the relevant goods to the Unlisted Location and the goods were checked and unloaded.

Grocery Haulers submitted invoices to C&S on a weekly basis for, inter alia, the labor, fuel, tax, and toll costs associated with Grocery Haulers' provision of Trucking Services ("Invoices"). Unlike the internal Grocery Haulers documents discussed above, the parties agree that the Invoices were presented to C&S for billing purposes. Grocery Haulers would send an Invoice to C&S every week, double-check many of its figures, and then submit a supplement to the Invoice or "true up" adjusting some of the relevant costs.

It is undisputed that many of the Invoices associated with the Disputed Deliveries contained incorrect information. The parties disagree, however, as to how much of and why the information was incorrect. C&S contends that Grocery Haulers intentionally altered information on the Invoices in order to hide the fact that it was making deliveries to the Unlisted Locations. As evidence, C&S points to the figures on the Invoices themselves, which it contends appear to reflect delivery to the Key Food Stores, as well as, inter alia, an

8

email from Grocery Haulers Operations Manager James Stapleton to
Grocery Haulers CFO Eddie Rishty ("Rishty") stating, in
reference to a Disputed Delivery, "We need to bury the miles on
this special Key Food perishable delivery."  Grocery Haulers
contends that any inaccurate information in the Invoices was due
to inadvertent or clerical error.  Grocery Haulers has admitted,
however, that the charges associated with the Disputed
Deliveries are roughly the same as those that would have been
associated with deliveries to the Key Food Stores.

    C&S points to three types of incorrect information on the
Invoices.  First, it alleges there were inaccuracies in certain
fields marked "Miles Billed," and points to four examples of
Disputed Deliveries for which the miles that appear on the
Invoice do not match the actual miles driven.  Rishty admits
that these fields are incorrect, and identifies two additional
examples of Disputed Deliveries for which the miles on the
Invoice do not reflect the actual miles driven.  Rishty
testifies, however, that C&S was not actually billed for the
incorrect mileage because the errors were caught and corrected
in the relevant "true up" for all but one of these deliveries.
He claims that the only inaccuracy that was not caught appears
to have been due to a clerical error.

    The second type of inaccuracy involves fields on the
Invoices that indicate miles driven by state.  C&S identifies 63

Disputed Deliveries in which the Invoice listed miles driven in a state in which the driver had not actually traveled.  C&S was charged for sales tax payments to the wrong State for these deliveries.  Grocery Haulers admits to only 47 such deliveries. Rishty testified that the inaccurate "Miles Billed" and miles by state resulted in a net cost increase to C&S of roughly $7.

The third type of inaccuracy involves fields on the Invoices marked "Labor Total."  This field represents the total compensation that Grocery Haulers provided its drivers for each delivery.  Rishty testified that the Labor Totals on each Invoice truthfully represented the total amount that Grocery Haulers spent to compensate its drivers.  In calculating the Labor Total, however, Grocery Haulers used information from the Daily Pay Reports.  As discussed above, these Daily Pay Reports used Location Values that, for Disputed Deliveries, did not correspond to the actual delivery locations.  In addition, Rishty testified that Grocery Haulers would often upwardly adjust drivers' compensation for Disputed Deliveries by adding compensation for store or traffic delay time in order to ensure that the drivers were paid at an appropriate hourly rate as required by relevant collective bargaining agreements.  Rishty states that this was necessary because of the extensive wait times that the drivers would experience at the Unlisted

Locations while goods were being checked and unloaded, for which they otherwise would not have been compensated.

C&S contests that these delays actually occurred.  C&S also contends that regardless of whether Grocery Haulers actually paid its drivers the amount listed on the Invoices, Grocery Haulers' false reporting resulted in inflated charges.  Hansen testified that C&S would have canceled these deliveries had it known the truth about Grocery Haulers' deliveries to Unlisted Locations.  The parties agree, however, that C&S was not charged more for the Disputed Deliveries than it would have been charged for deliveries to the relevant Key Food Stores.

Hansen contends that C&S discovered evidence of the Disputed Deliveries in October 2010.  Grocery Haulers claims that C&S knew about the Disputed Deliveries as early as January 2010.  Vanessa DeViccaro ("DeViccaro"), a former C&S senior account executive for the Key Food account, testified that by January 2010 she had come to believe that Key Food was "diverting" products purchased from C&S.  DeViccaro further testified that she reported her belief to her superiors, and that Key Food advised her that Grocery Haulers was delivering the loads to a location in Connecticut, which she assumed to be Bozzuto's.  DeViccaro also noted, however, that she "did not know or have any understanding that Grocery Haulers was

11

delivering [product bought by Key Food from C&S] directly to the Connecticut location from C&S's distribution facilities."

Grocery Haulers contends that the practice of "diverting," or making deliveries to locations other than the store that placed the order, is widespread in the groceries industry, and notes that Key Food employee Gary Spindel recalled "joking about" diverting with Jay Carter, a C&S Vice President.  C&S's expert Henry Seaton testified that re-routing shipments so that they go directly to a shipper's competitor, and covering up this practice by manipulating the associated shipping documents, is not common industry practice.

Between October 2010 and May 2011, C&S claims that it conducted an investigation into the nature and extent of Grocery Haulers' re-routing, and prepared to transition to a different carrier.  Grocery Haulers stopped delivering products to the Unlisted Locations in or around April 2011 after C&S raised the issue with Key Food.  On May 5, 2011, counsel for C&S sent a letter to counsel for Grocery Haulers purporting to terminate the Trucking Agreement.  The letter stated that Grocery Haulers' "misconduct strikes at and undermines the very heart of C&S's and Grocery Haulers' business and, indeed, trust relationship" and was not susceptible to cure.

Grocery Haulers filed its original complaint in this action on May 9, 2011.  After a May 10 conference with the parties, the

12

Court temporarily restrained C&S from terminating the Trucking Agreement on May 11.  Grocery Haulers amended its complaint on June 27.

The amended complaint (the "Complaint") contains four counts against C&S seeking 1) a declaration that Grocery Haulers has not breached the Trucking Agreement with C&S; 2) a preliminary injunction to prevent C&S from breaching the Trucking Agreement; 3) damages based on C&S's tortious interference; and 4) damages based on C&S's conspiracy to interfere with a separate 1997 agreement between Grocery Haulers and Pathmark Stores, Inc.  By Opinion of September 12, the motion brought by C&S to dismiss Grocery Haulers' damages claims under Counts III and IV of the Complaint was granted.  See Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc., 11 Civ. 3130 (DLC), 2011 WL 4031203 (S.D.N.Y. Sept. 12, 2011).  By Order of July 13, 2011, and with the consent of the parties, the Court consolidated the injunctive phase of the case with a trial on the merits.

C&S filed its Counterclaims on November 7.  The Counterclaims contain five counts against Grocery Haulers seeking 1) damages based on Grocery Haulers' breach of contract in the form of the Trucking Agreement; 2) declaratory relief stating that C&S was within its rights to terminate the Trucking Agreement as it did, that it need not tender any further

13

performance under the Trucking Agreement, and that it need not provide Grocery Haulers an opportunity to cure; 3) damages based on Grocery Haulers' breach of separate contracts consisting of each C&S Waybill that accompanied delivery to an Unlisted Location; 4) damages based on violations of the Connecticut Unfair Trade Practices Act ("CUTPA"); and 5) damages and attorneys' fees pursuant to 49 U.S.C § 14704 based on Grocery Haulers' violation of 49 U.S.C § 13708, the so called "Truth-in-Billing" statute. C&S asserts that its damages consist of the total amount that C&S was invoiced for 142 Disputed Deliveries, estimated to be $65,000, and all or some of Grocery Haulers' annual $2.5 million Management Fee.

The parties filed cross-motions for summary judgment on April 6, 2012. The motions became fully submitted on May 14. On May 24, C&S filed a motion to file a sur-reply memorandum as to Grocery Haulers' motion for summary judgment, and attached the proposed sur-reply as an exhibit to the motion. Grocery Haulers opposed the motion to file a sur-reply by letter received May 29.

### DISCUSSION

As a preliminary matter, C&S's May 24, 2012 motion to file a sur-reply memorandum is granted. "[C]ourts have broad discretion to consider arguments in a sur-reply," Newton v. City

of New York, 738 F. Supp. 2d 397, 417 n.11 (S.D.N.Y. 2010), particularly when new arguments are put forth in a reply brief. See, e.g., Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991). In its reply brief, Grocery Haulers put forward a number of new arguments and even submitted new evidentiary materials, including:

- A supplemental affidavit of C&S employee DeVicarro;

- An argument regarding an exception to the rule that affirmative defenses are waived if not properly pled;

- An assertion that C&S had decided to transition to another motor carrier prior to discovering Grocery Haulers' re-routing;

- An argument regarding the parties' agreement as to the scope of the testimony of C&S's 30(b)(6) witness; and

- An argument that the Waybills are not bills of lading.

Grocery Haulers argues that C&S's motion for leave to file a sur-reply memorandum was not procedurally proper because C&S submitted its sur-reply papers alongside the motion itself. See Travelers Ins. Co. v. Buffalo Reinsurance Co., 735 F. Supp. 492, 495 (S.D.N.Y. 1990) ("the proposed [sur-reply] papers should not accompany the request for leave to submit them") (citation omitted). Regardless of any procedural impropriety in C&S's submissions, however, Grocery Haulers' reply raised "new issues material to the disposition of the question[s] before the court"

15

and, accordingly, C&S's Sur-Reply is accepted.  United States v. Int'l Bus. Machines Corp., 66 F.R.D. 383, 384 (S.D.N.Y. 1975).

I.   Summary Judgment Standard

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

16

Only disputes over material facts -- "facts that might affect
the outcome of the suit under the governing law" -- will
properly preclude the entry of summary judgment.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475
U.S. 574, 586 (1986) (stating that the nonmoving party "must do
more than simply show that there is some metaphysical doubt as
to the material facts").

II.  C&S's Counterclaim for Violation of 49 U.S.C. § 13708

     Both parties have moved for summary judgment on Count V of
C&S's Counterclaims, claiming that Grocery Haulers is liable for
damages under 49 U.S.C. §§ 14704(a)(2) ("Section 14704") and
13708, the "Truth-in-Billing" statute ("Section 13708").
Although C&S has put forward facts demonstrating that Grocery
Haulers violated subsection (a) of Section 13708 as a matter of
law, summary judgment is not proper in light of contested issues
of material fact as to damages.

     Statutory interpretation must "begin with the language
employed by Congress and the assumption that the ordinary
meaning of that language accurately expresses the legislative
purpose."  Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt.
Dist., 541 U.S. 246, 252 (2004) (citation omitted).  If a
statute's language is unambiguous, "the sole function of the
courts is to enforce it according to its terms."  Katzman v.

Essex Waterfront Owners LLC, 660 F.3d 565, 568 (2d Cir. 2011) (citation omitted).  In other words, "[w]hen a court determines that the language of a statute is unambiguous, its inquiry is complete."  United States v. Santos, 541 F.3d 63, 67 (2d Cir. 2008).

When construing the plain statutory text, courts are not to "construe each phrase literally or in isolation."  Rather, a court must "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole."  Pettus v. Morgenthau, 554 F.3d 293, 297 (2d Cir. 2009).  The plain language of a statute is considered in the context in which it is used and the "broader context of the statute as a whole."  In re Ames Dept. Stores, Inc., 582 F.3d 422, 427 (2d Cir. 2009) (citation omitted).  Thus, "the preferred meaning of a statutory provision is one that is consonant with the rest of the statute."  Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002).

Section 13708 provides, in its entirety:

(a) Disclosure. -- A motor carrier subject to jurisdiction under subchapter I of chapter 135 shall disclose, when a document is presented or electronically transmitted for payment to the person responsible directly to the motor carrier for payment or agent of such responsible person, the actual rates, charges, or allowances for any transportation service and shall also disclose, at such time, whether and to whom any allowance or reduction in charges is made.

(b) False or misleading information. -- No person may cause a motor carrier to present false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction.

(c) Allowances for services. -- When the actual rate, charge, or allowance is dependent upon the performance of a service by a party to the transportation arrangement, such as tendering a volume of freight over a stated period of time, the motor carrier shall indicate in any document presented for payment to the person responsible directly to the motor carrier that a reduction, allowance, or other adjustment may apply.

49 U.S.C. § 13708.  49 U.S.C § 14704(a)(2) creates a private right of action against a carrier when a person sustains damages as a result of, inter alia, the carrier's Section 13708 violation; 49 U.S.C § 14704(e) permits the recovery of attorneys' fees in such actions.  See 49 U.S.C § 14704.

A.   Subsection (a)

Grocery Haulers does not dispute that it is a "motor carrier subject to jurisdiction under subchapter I of chapter 135" or that the Invoices it submitted to C&S are documents "presented . . . for payment to the person responsible directly to the motor carrier for payment." 49 U.S.C. § 13708.  The parties disagree only on whether the Invoices disclosed Grocery Haulers' "actual . . . charges."  Id.

It is undisputed that Grocery Haulers submitted inaccurate mileage figures in a number of its Invoices and billed C&S based on these inaccurate miles for at least one delivery.  It is also

19

undisputed that Grocery Haulers billed C&S for State road use
taxes that it did not actually incur for at least 47 deliveries.
These inaccuracies amount to a failure to disclose Grocery
Haulers' actual charges in violation of Section 13708(a).

Grocery Haulers also violated this subsection as to those
deliveries in which the relevant mileage was reported
inaccurately, but the error was caught and C&S was billed only
for miles actually driven.  For such deliveries, the miles
reported in the Invoice do not match up with the charges billed
to C&S.  Grocery Haulers conveyed a charge for such deliveries,
but it is not the "actual" charge for the service described by
the relevant mileage figures.  Cf. TRW Inc. v. Andrews, 534 U.S.
19, 31 (2001) (courts should construe statutory language to
avoid interpretations that would render any phrase superfluous).
Accordingly, Grocery Haulers has violated Subsection (a) as a
matter of law as to those deliveries as well.

Genuine issues of material fact exist as to whether the
alleged inaccuracies in the "Labor Total" fields reflect a
failure to disclose "actual . . . charges."  The parties dispute
whether the charges in these fields were artificially inflated
in order to hide Grocery Haulers' re-routing, or simply
reflected appropriate compensation for drivers' wait time.  This
factual determination will be left to the jury.  Although
Grocery Haulers notes that regardless of why it paid its drivers

20

the amount listed in the Labor Total Fields, it is undisputed that it _actually_ paid these amounts, subsection (a) does not give motor carriers a blank check.  Improperly inflated labor charges are not "actual" charges for the service described on the Invoice.

B.   Subsection (b)

Section 13708(b) disallows a person from causing a motor carrier "to present false or misleading information on a document about the actual rate, charge, or allowance to a party to the transaction."  49 U.S.C. § 13708(b).  The parties do not dispute that the Invoices were "document[s] about an actual rate, charge, or allowance," that C&S was "a party to the transaction," that the Invoices were "present[ed]" to C&S, and that C&S is a motor carrier.  _Id._  They disagree only on whether Grocery Haulers "cause[d] a motor carrier to present false or misleading information" on any Invoice.

Grocery Haulers argues that Section 13708(b) does not apply to it because it is a motor carrier.  This is incorrect.  The plain language of the statute applies to "person[s]" who "cause a motor carrier to present false or misleading information."  49 U.S.C. § 13708(b).  Under the relevant statutory definitions, the term "person" includes corporations like Grocery Haulers.  _See_ 49 U.S.C. § 13102; 1 U.S.C. § 1.  Grocery Haulers is both a legal person and a motor carrier.

Nevertheless, the statute does not apply to Grocery Haulers because it did not "cause a motor carrier" to engage in the relevant conduct; rather, Grocery Haulers <u>itself</u> engaged in this conduct.  There is a legal distinction between performing an act directly and causing an act to be done.  <u>Cf.</u> 18 U.S.C. § 2(b) (distinguishing between "willfully caus[ing] an act to be done" and "directly perform[ing]" it).  C&S accuses Grocery Haulers of only the former; subsection (b) addresses only the latter. Accordingly, Grocery Haulers did not violate subsection (b) as a matter of law.

C.   Subsection (c)

Grocery Haulers did not violate Section 13708(c) as a matter of law because there has been no evidence submitted by either party that Grocery Haulers' "actual rate, charge, or allowance" was "dependent upon the performance of a service by a party to the transportation arrangement."  49 U.S.C. § 13708(c). Section 13708(c) appears to require motor carriers to disclose any off-bill discounts or other payment adjustments in certain documents presented for payment.  C&S argues that Grocery Haulers violated this provision, however, because it conferred an "allowance" on Key Food, Bozzuto's, and the other Unlisted Locations by allowing them to reduce or eliminate their shipping costs; this "allowance" was dependent on Grocery Haulers' performance of a service, namely completion of the Disputed

22

Deliveries; and the "allowance" was not disclosed on the Invoices.  C&S defines the word "allowance" broadly to mean simply "benefit."

Read as a whole and in context, Section 13708(c) requires disclosure of possible monetary adjustments to a "rate, charge, or allowance" resulting from the performance of a service by a party to the transportation arrangement.  The statute explicitly requires carriers to disclose "a reduction, allowance, or other adjustment" that "may apply" to "any document presented for payment."  49 U.S.C. § 13708(c) (emphasis supplied).  Congress's use of the word "other" in this provision implies that reductions and allowances are simply different types of "adjustment[s]."  And the fact that such adjustments "may apply" to "document[s] presented for payment" implies that these adjustments will be monetary.  The statute's legislative history supports this reading, see House Report 103-359, Nov. 15, 1993, 103 H.R. Rpt. 103-359, 11, 1993 U.S.C.C.A.N. 2534, 2538 (explaining how the predecessor to Section 13708(c) "addresses the payment of discounts to someone not paying the shipping costs" (emphasis supplied)), as does Supreme Court precedent. See, e.g., Lehigh Valley R. Co. v. United States, 243 U.S. 444, 445-47 (1917) (referring to a carrier's payment of a percentage of its published rates and a salary to a freight forwarder in exchange for the freight forwarder's use of the carrier's

23

services as an "allowance").  C&S does not allege that any monetary rate, charge, or allowance appearing on the Invoices was contingent on performance of any special service by Grocery Haulers or any other party to the transportation arrangement. C&S cites to no authority in favor of its interpretation outside the opinion of its own expert.  The legislative history cited by Grocery Haulers, as well as the historical usage of the term in Lehigh Valley, 243 U.S. at 445-47, resolves any remaining ambiguity in Grocery Haulers' favor.

D.   Damages

To state a claim under Section 14704(a)(2), Grocery Haulers must allege that it sustained damages "as a result of an act or omission" in violation of Section 13708.  49 U.S.C. § 14704(a)(2); see also Fulfillment Servs. Inc. v. United Parcel Serv., Inc., 528 F.3d 614, 621 (9th Cir. 2008) (noting that a claimant may only recover damages sustained as a consequence of the relevant violation, not restitution or penalties).  Section 14704 does not contemplate damages for "abstract violations." Id.

Neither party has demonstrated the absence of a material factual question on this issue.  C&S claims that had Grocery Haulers complied with the terms of Section 13708, C&S would have realized that Grocery Haulers was re-routing deliveries to the Unlisted Locations and would have cancelled the Disputed

24

Deliveries.  Accordingly, C&S alleges that it would have incurred no delivery costs had Grocery Haulers complied with the statute, and C&S is therefore entitled to recover the entire amount Grocery Haulers invoiced for the Disputed Deliveries. Grocery Haulers alleges that the Disputed Deliveries were of substantial value to Grocery Haulers because, inter alia, they caused Key Food to increase the size of its orders from C&S.  In fact, Grocery Haulers alleges that the Disputed Deliveries benefitted C&S on net and C&S's termination of the Trucking Agreement was pretextual.  These intensely fact-based arguments are not appropriate for resolution on summary judgment.

Grocery Haulers argues that C&S cannot support a claim for damages under Sections 13708 and 14704(a)(2) because C&S alleges that it should not have been charged for shipping at all.  In support of this proposition, Grocery Haulers relies on Haley Hill Designs, LLC v. United Parcel Serv., Inc. CV 09-4212-GHK PLAX, 2009 WL 4456209 (C.D. Cal. Nov. 23, 2009), in which a California district court denied recovery under Sections 13708 and 14704(a)(2) because the plaintiff did not claim that the shipping rate he was charged was falsely inflated or otherwise inaccurate.  Instead, the plaintiff claimed that he had been charged for a package that he never tendered for delivery and therefore should not have been charged for delivery of this package at all.  See id. at *1, *3.

In contrast to the plaintiff in <u>Haley Hill</u>, C&S alleges <u>both</u> that it was charged an inflated or otherwise inaccurate shipping rate, <u>and</u> that it should not be charged at all for the relevant deliveries.  C&S's theory is that the very inaccuracies that violated Section 13708 caused it to continue with shipments that it otherwise would have cancelled.  This theory of causation is absent from <u>Haley Hill</u>, and is sufficient to support a claim for damages under the plain language of Sections 13708 and 14704(a)(2).

    E.   Attorneys' Fees

Grocery Haulers argues that even if C&S can sustain a claim for damages under Sections 13708 and 14704, C&S has waived its right to attorneys' fees pursuant to Section 14704.  A party may waive its right to attorneys' fees under Section 14704 if it agrees to do so expressly and in writing.  <u>See</u> 49 U.S.C. § 14101(b)(1).

In support of this argument, Grocery Haulers points to Section 9.05 of the Trucking Agreement, which provides, <u>inter alia</u>, that each part shall bear its own "fees and disbursements of counsel . . . incurred in connection with the negotiation and execution of this Agreement and the transactions contemplated hereby."  The events at issue in this litigation, however, have no connection with the negotiation and execution of the Trucking Agreement itself.  And delivery to the Unlisted Locations was

not "contemplated" by the Trucking Agreement because, as discussed in Section III(A)(i) <u>infra</u>, the Trucking Agreement obligated Grocery Haulers to deliver to the Listed Locations only.  Accordingly, C&S has not waived its right to attorneys' fees.

 F. Notification

 Grocery Haulers claims that C&S lacks standing to pursue its Truth-in-Billing claim under 49 U.S.C. § 13710(a)(3)(B). This provision establishes a 180-day notification period for shippers engaged in "billing disputes" under Section 13710.  <u>See</u> 49 U.S.C. § 13710(a)(3)(B).  Grocery Haulers avers that because C&S did not notify it of the instant "billing dispute[]" within the requisite 180 days, it is barred from bringing a suit for damages pursuant to Section 14704(a)(2).

 Grocery Haulers is wrong.  This case is not a mere "billing dispute."  Rather, C&S alleges that Grocery Haulers engaged in fraudulent and deceptive business practices and asserts a cause of action under Section 14704(a)(2).  The statute of limitations for such claims is four years.  <u>Owner-Operator Indep. Drivers Ass'n, Inc. v. Mayflower Transit, LLC</u>, 615 F.3d 790, 793 (7th Cir. 2010), <u>cert. denied,</u> 131 S. Ct. 1612 (2011).

III. Grocery Haulers' Motion for Summary Judgment

 Grocery Haulers moves for summary judgment on its declaratory judgment claim, as well as all five of C&S's

counterclaims.  Grocery Haulers' motion is denied as to all claims and counterclaims except Count IV of C&S's Counterclaims for violation of the Connecticut Unfair Trade Practices Act ("CUTPA").

A.   Grocery Haulers' Claim for Declaratory Judgment

Grocery Haulers asks the Court to declare that C&S cannot terminate the Trucking Agreement as a matter of law.  The Trucking Agreement includes a termination clause, which states that C&S may terminate the agreement:

> by giving a notice of termination to [GHI] . . . if, for any reason other than a default by [C&S] under this Agreement or a Carrier Event of Force Majeure, [GHI] breaches any other material obligation under this Agreement . . . <u>unless such breach is curable and is cured within 30 days</u> following receipt by [GHI] of notice of such breach from [C&S].

(Emphasis supplied.)  In accordance with the terms of this provision, the parties agree that proper termination of the Trucking Agreement by C&S requires 1) breach of a contractual obligation by Grocery Haulers that is 2) material, and 3) not subject to cure.[2]  Grocery Haulers is not entitled to summary judgment because the undisputed evidence indicates that it breached the Trucking Agreement by making deliveries to the

---

[2] It is undisputed that the Trucking Agreement constitutes a valid contract, that the above clause governs C&H's attempt to terminate the Trucking Agreement, and that C&S gave a notice of termination to Grocery Haulers without providing Grocery Haulers an opportunity to cure.

Unlisted Locations, and there are genuine issues of material fact as to the materiality of the breach.

        i.   Breach

The parties agree that New York law applies.  C&S alleges express breaches of Sections 2.01 and 6.01 of the Trucking Agreement, as well as New York's implied covenant of good faith and fair dealing.  The parties disagree not only on the facts underlying Grocery Haulers' alleged breach, but also the nature of Grocery Haulers' obligations under the express terms of the contract.  It is therefore necessary, as a preliminary matter, to interpret the language of the Trucking Agreement and clarify the parties' resulting obligations.

Under New York law, "the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (citation omitted).  "In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted). "Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire

agreement." <u>Law Debenture Trust Co. of New York v. Maverick</u>
<u>Tube Corp.</u>, 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted).
"[W]hether a written contract is ambiguous is a question of law
for the court." <u>JA Apparel Corp. v. Abboud</u>, 568 F.3d 390, 396
(2d Cir. 2009).

Contractual terms are ambiguous when they suggest "more
than one meaning when viewed objectively by a reasonably
knowledgeable person who has examined the context of the entire
integrated agreement." <u>Id.</u> (citation omitted). If the terms
are ambiguous, and extrinsic evidence is required "to ascertain
the correct and intended meaning of a term," summary judgment
must be denied. <u>Alexander & Alexander Services, Inc. v. These</u>
<u>Certain Underwriters at Lloyd's, London, England</u>, 136 F.3d 82,
86 (2d Cir. 1998).

Contract language presents no ambiguity where it has "a
definite and precise meaning, unattended by danger of
misconception in the purport of the contract itself, and
concerning which there is no reasonable basis for a difference
of opinion." <u>JA Apparel</u>, 568 F.3d at 396 (citation omitted).
"Language whose meaning is otherwise plain does not become
ambiguous merely because the parties urge different
interpretations in the litigation." <u>Id.</u>  Thus, when the
contract's terms have "a definite and precise meaning and are

not reasonably susceptible to differing interpretations, they are not ambiguous." Id. (citation omitted).

> a.   Section 2.01

Section 2.01 of the Trucking Agreement is unambiguous.  As amended on January 1, 2003, the provision, titled "Trucking Services," states in pertinent part:

> [C&S] hereby engages [GHI], and [GHI] hereby agrees to perform for [C&S] that level of grocery deliveries to the Stores as historically performed by [GHI] . . . .

(Emphasis supplied.)  The "Definitions" section of the Trucking Agreement, Section 1.01, defines "Stores" as follows:

> all existing Key Food stores as itemized on Schedule 1.01(d), for so long as they continue to operate and (ii) all new Key Food stores operating under license from Kay Food Stores Cooperative, Inc. under the "Key Food" and any other banner sponsored by the Key Food organization.

It is undisputed that none of the Unlisted Locations fit within this description, and that Grocery Haulers transported grocery deliveries to these locations.

Read objectively and in context, the phrase "to the Stores" in Section 2.01 has only one meaning.  It means, as C&S contends, that Grocery Haulers is obligated physically to deliver groceries to the Listed Locations.  Summary judgment on this issue is therefore denied.

In urging summary judgment, Grocery Haulers does not suggest that the phrase "to the Stores" in Section 2.01 is

ambiguous and may be read to include delivery to an Unlisted
Location.  Instead, it argues that the phrase is merely
descriptive, not limiting, and that Section 2.02, titled
"Scheduling," controls Grocery Haulers' obligations as to
routing deliveries.  Although Section 2.02 states, "C&S shall
perform all routing of Trucking Services," it is uncontested
that the parties later agreed that Grocery Haulers would
determine delivery routes during the relevant period.  Grocery
Haulers further notes that "[w]here a contract . . . employs
contradictory language, specific provisions control over general
provisions," and claims that Section 2.01 addresses the scope of
the agreement generally, while Section 2.02 addresses delivery
routing specifically.  Green Harbour Homeowners' Ass'n, Inc. v.
G.H. Dev. & Const., Inc., 789 N.Y.S.2d 319, 321 (N.Y. App. Div.
2005).

     This argument fails.  The relevant language in Section 2.01
is not a general provision.  It addresses where or to whom
deliveries will be shipped.  Nor are the provisions
contradictory: "routing" refers to the determination of the path
from point A to point B, while "to the Stores" designates a
particular destination, i.e., point B.  Moreover, irrespective
of the parties' later understanding, the text of Section 2.02
does not grant routing authority to Grocery Haulers.  Grocery
Haulers does not explain how a later understanding between the

parties on routing, not included in the Trucking Agreement itself or, apparently, reduced to writing elsewhere, could control over the explicit language of Section 2.01.

          b.   Section 6.01

Nor is Grocery Haulers entitled to a declaration that it did not breach Section 6.01 of Trucking Agreement.  Under Section 6.01, titled "Compliance with Applicable Law," Grocery Haulers covenants that, "In performing its obligations hereunder, it will comply with all applicable laws, rules, regulations, ordinances, orders and other governmental requirements."  Grocery Haulers does not contest that 49 U.S.C. § 13708 is an "applicable law."  For the reasons discussed above, Grocery Haulers breached this provision by violating Section 13708, notwithstanding the fact that genuine issues of material fact exist as to the resulting damages and some of the violations.

          c.   Covenant of Good Faith and Fair Dealing

Grocery Haulers contends that C&S bases its breach of contract claim exclusively on New York's implied covenant of good faith and fair dealing (the "Covenant"), and that such "stand-alone" claims fail as a matter of law because they are preempted by the Federal Aviation Administration Authorization Act ("FAAAA").  The FAAAA preempts any state "law related to a

price, route, or service of any motor carrier."  49 U.S.C. §
14501(c)(1).

C&S does not base its breach of contract claim exclusively
on the Covenant; rather, it alleges multiple breaches of the
contract's express terms contained in Sections 2.01 and 6.01 of
the Trucking Agreement.  Grocery Haulers avers that C&S is bound
by the testimony of its 30(b)(6) deponent, who allegedly stated
that C&S based its termination of the Trucking Agreement
exclusively on breach of the Covenant.  Irrespective of the
substance of this deponent's testimony, however, the deponent
had been designated by the parties to testify about the terms of
the Trucking Agreement and any subsequent amendments, not C&S's
factual and legal bases for termination.  Accordingly, C&S will
not be bound by his testimony on this issue and its breach of
contract claims survive.

ii.  Materiality

Grocery Haulers contends that it is entitled to summary
judgment because, even if it breached the Trucking Agreement,
any breach was not material as a matter of law.  According to
Grocery Haulers, the agreement at its core called for the
provision of Trucking Services at actual cost plus a long-term
purchase commitment from Key Food, which Grocery Haulers
provided.  Grocery Haulers further alleges that it re-routed
only 0.8% of C&S's deliveries during the period in question.

34

This argument fails.  Under New York law, "[f]or a breach of contract to be material, it must go to the root or essence of the agreement between the parties, or be one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."  New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006) (citation omitted); see also Frank Felix Associates, Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997) ("A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract.").

The undisputed facts demonstrate that Grocery Haulers re-routed deliveries to locations other than the Key Food Stores, violated Section 13708 as a matter of law, and re-routed deliveries to a competitor of C&S who did not incur shipping and reloading costs as a result.  It is a genuine issue of material fact as to whether such conduct went to "essence of the agreement."  New Windsor Volunteer Ambulance Corps, 442 F.3d at 117.  The materiality of any breaches will therefore be left to the jury.

### iii. Opportunity to Cure

The parties agree that the Trucking Agreement required C&S to provide Grocery Haulers with notice and an opportunity to

35

cure any material breach prior to terminating the contract, so long as the breach is curable.  The parties also agree that C&S did not provide such a notice and opportunity.  Grocery Haulers claims that any material breach of the Trucking Agreement was curable or has already been cured.  Summary judgment on this issue is denied.

New York law permits a party to terminate an agreement immediately without notice and an opportunity to cure when "the misfeasance is incurable and when the cure is unfeasible." Needham v. Candie's, Inc., 01 Civ. 7184 (LTS) (FM), 2002 WL 1896892, at *4 (S.D.N.Y. Aug. 16, 2002), aff'd, 65 F. App'x 339 (2d Cir. 2003) (citation omitted).  A party is not required to adhere to the cure provision of a contract when doing so "would amount to a useless gesture."  Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) (citation omitted).  When a breach involves deceptive conduct that goes to the essence of the contract and fundamentally destroys the parties' relationship, it may not be subject to cure.  See, e.g., Wisser Co., Inc. v. Mobil Oil Corp., 730 F.2d 54, 58-61 (2d Cir. 1984) (breach not subject to cure when company sold misbranded gasoline in violation of franchise agreement and federal statute); Southland Corp. v. Froelich, 41 F. Supp. 2d 227, 245-46 (E.D.N.Y. 1999) (breach not subject to

cure when a franchisee engaged in systematic fraud for personal gain by withholding revenue from franchisor).

Grocery Haulers notes that it stopped re-routing deliveries prior to receiving C&S's termination letter, and argues that it can cure any breach by paying C&S any overcharges that it may have incurred for the Disputed Deliveries.  Grocery Haulers further alleges that it only re-routed deliveries at the express direction of Key Food, and that this re-routing stopped as soon as C&S raised the issue with Key Food.

These claims misconstrue the nature of C&S's allegations. C&S claims not only that Grocery Haulers re-routed deliveries at the direction of Key Food, but that Grocery Haulers engaged in an intentional and fraudulent cover-up operation intended to mislead C&S into believing that its deliveries were being made to the Key Food Stores.  Grocery Haulers has put forward sufficient facts, such as the Key Food Store stamps on the Waybills, the incorrect and misleading information on the Invoices, and Grocery Haulers' manipulation of its internal billing documents, such that a reasonable fact-finder could conclude that Grocery Haulers' actions amounted to a fraudulent scheme of deception, went to the essence of the contract, and fundamentally destroyed the parties' relationship.

iv.   Notice

Grocery Haulers claims it should be granted summary judgment on its declaratory judgment claim because Section 9.07 of the Trucking Agreement required C&S to send any notice of termination to Grocery Haulers' President, Jacobsen, and C&S in fact sent its letter to Grocery Haulers' counsel at Herrick, Feinstein LLP.  Grocery Haulers is incorrect.  Contractual notice provisions are not to be construed like "common law pleading requirement[s] under which every slip would be fatal." Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 925 (2d Cir. 1977).  It is undisputed that Grocery Haulers received actual notice of the Termination Letter, and Grocery Haulers does not explain how it suffered any detriment or prejudice as a result of C&S's deviation.  Jacobsen agreed in his deposition that he received and read the Termination Letter the same month it was mailed.

v.   Election of Remedies

Grocery Haulers claims that C&S is barred from terminating the Trucking Agreement under the doctrine of election of remedies.[3]  Under New York law, the doctrine provides as follows:

---

[3] Election of remedies is an affirmative defense, and as such may be waived if not raised at the pleading stage.  See Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994).  The defense will not be waived, however, if it is "raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing

> When a party materially breaches a contract, the non-
> breaching party must choose between two remedies -- it
> can elect to terminate the contract and recover
> liquidated damages or it can continue the contract and
> recover damages solely for the breach.  A party can
> indicate that it has chosen to continue the contract
> by continuing to perform under the contract or by
> accepting the performance of the breaching party.
> Once a party elects to continue the contract, it can
> never thereafter elect to terminate the contract based
> on that breach, although it retains the option of
> terminating the contract based on other, subsequent
> breaches.

ESPN, Inc. v. Office of Com'r of Baseball, 76 F. Supp. 2d 383,

387-88 (S.D.N.Y. 1999) (citation and alterations omitted).  In

other words, "[o]nce a party has elected a remedy for a

particular breach, his choice is binding with respect to that

breach and cannot be changed." Lucente v. Int'l Bus. Machines

Corp., 310 F.3d 243, 258-59 (2d Cir. 2002).  For the doctrine to

apply, it is also necessary that "in reliance upon that

election, that party must also have gained an advantage, or the

opposing party must have suffered some detriment." Sofi Classic

S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 238 (S.D.N.Y.

2006) (citation omitted).

---

party." Am. Fed. Group, Ltd. v. Rothenberg, 136 F.3d 897, 910
(2d Cir. 1998).  Grocery Haulers moved for leave to amend its
answer to include this defense in its brief in support of its
motion for summary judgment.  This brief was submitted shortly
after Grocery Haulers obtained new information during the
deposition of DeViccaro that it believed relevant to an election
of remedies defense.  C&S had a full opportunity to respond to
the defense in its Opposition and Sur-Reply, and will not be
unfairly prejudiced if the defense is entertained. Cf. Curry v.
City of Syracuse, 316 F.3d 324, 331 (2d Cir. 2003).  Leave to
amend is granted.

A party need not choose its remedy immediately upon
discovering a breach.   Rather, a party may wait a "reasonable
time" after discovering an alleged breach before terminating the
contract.   ESPN, 76 F. Supp. 2d at 393-94 (citation omitted).
The reasonableness of any delay

> depends on the nature of the performance to be
> rendered under the contract.   The critical factor is
> not the passage of time but whether the non-breaching
> party has taken an action (or failed to take an
> action) that indicated to the breaching party that
> [it] had made an election.

Id. at 394 (citation omitted).   Grocery Haulers contends that
C&S learned about the Disputed Deliveries in January 2010, and
elected to continue performing under the contract even after
discovering Grocery Haulers' breach.   Both of these contentions
are incorrect.

Grocery Haulers bases the first contention on the testimony
of DeViccaro.   Although DeViccaro testified that she came to
believe Key Food was "diverting" product purchased from C&S in
January 2010, and reported this to supervisors, she also
testified unequivocally that she "did not know or have any
understanding" that Grocery Haulers was delivering products
"directly" from C&S to a non-Key Food Store.   C&S bases its
claims not on "diverting" but on Grocery Haulers' direct
delivery of goods from C&S to the Unlisted Locations without
informing C&S or obtaining its consent, as well as allegations

of a fraudulent cover-up scheme.  DeViccaro's testimony as to what she learned and reported in January 2010 is therefore irrelevant.

Likewise, Grocery Haulers has not established as a matter of law that C&S continued performing the contract even after discovering Grocery Haulers' breach.  Grocery Haulers claims it terminated the contract not based on a mere handful of Disputed Deliveries.  Rather, following a months-long investigation, C&S based its termination on behavior that it alleges went to the essence of the contract -- a long-term pattern of fraud and deceit that it claimed "undermine[d] the very heart" of the parties' "trust relationship."  Accordingly, C&S was entitled to conduct a reasonable investigation to determine the nature and scope of Grocery Haulers' pattern of behavior prior to electing its remedy.  C&S could not render performance indicating to Grocery Haulers that it had made an election as to breaches the scope of which C&S did not yet understand.

Grocery Haulers cites to Bigda v. Fischbach Corp., 898 F. Supp. 1004 (S.D.N.Y. 1995), aff'd, 101 F.3d 108 (2d Cir. 1996), for the proposition that a claimant can elect to continue a contract even when the claimant experiences multiple, cumulative breaches over time that he claims needed to reach a certain point in order to constitute a material breach.  Id. at 1011-13. Unlike the defendant in Bigda, however, Grocery Haulers has not

41

established that C&S continued to perform even after it "knew of all of the breaches that are at issue." Id. at 1013.

B.   C&S's Counterclaim for Breach of Contract

C&S's breach of contract counterclaim survives summary judgment. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011). Grocery Haulers does not dispute that the Trucking Agreement constituted a contract between the parties, nor does it contend that C&S failed adequately to perform its obligations under the Agreement. Rather, Grocery Haulers argues that C&S has failed to put forth evidence tending to show that Grocery Haulers breached a specific provision of the Agreement or that any damages flowed therefrom. For the reasons discussed above, however, Grocery Haulers breached Sections 2.01 and 6.01 of the Trucking Agreement.

Grocery Haulers argues that it is entitled to summary judgment because C&S has not established proof of damages. Grocery Haulers is wrong. "Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003).

C&S claims that it is entitled to recover all the payments it made to Grocery Haulers for the Disputed Deliveries because the Disputed Deliveries were of no value to C&S and C&S would have cancelled them had it known about them.  C&S also claims that it is entitled to all or some of its annual management fee because it did not receive the full bargained-for value of the Trucking Services.

Grocery Haulers contends that recovery under C&S's damages theory would, in fact, put C&S in a better position than C&S would have inhabited absent any breach.  Grocery Haulers claims that C&S is entitled to no damages because the total charges associated with the Disputed Deliveries were less than the charges that would have been associated with deliveries to the Key Food Stores, and because Grocery Haulers' re-routing caused Key Foods to increase the size of its orders from C&S and thus increased C&S's revenue.

Any factual finding on these issues hinges largely on the questions of what C&S would or would not have done absent any breach by Grocery Haulers, and what value, if any, is to be placed on the services actually provided by Grocery Haulers. These are questions of fact for the jury.

C.   C&S's Counterclaim for Breach of Bills of Lading

C&S alleges in Count III of its Counterclaims that each Waybill was a separate, valid, and enforceable contract between

C&S and Grocery Haulers, and Grocery Haulers materially breached these contracts by delivering to locations other than those specified in the "Customer" field of each Waybill.  C&S claims that the Waybills were bills of lading, and as such constituted enforceable contracts.  See Porky Products, Inc. v. Nippon Exp. U.S.A. (Illinois), Inc., 1 F. Supp. 2d 227, 230 (S.D.N.Y. 1997), aff'd sub nom. Porky Products, Inc. v. Nippon Express U.S.A. (Illinois), Inc., 152 F.3d 920 (2d Cir. 1998) ("A bill of lading is a contract between a shipper and a carrier and, thus, is subject to the law of contract.").

Grocery Haulers argues that it is entitled to summary judgment on this issue because the Waybills do not contain sufficient information to constitute bills of lading and are therefore not enforceable contracts.  Specifically, Grocery Haulers claims that the Waybills are missing the terms and conditions of shipment, the price, and the means of payment. See U.S. Gold Corp. v. Fed. Exp. Corp., 719 F. Supp. 1217, 1222-23 (S.D.N.Y. 1989).  Department of Transportation regulations in place during the relevant period, however, required bills of lading to include only the following:

   (a)  Names of consignor and consignee.

   (b)  Origin and destination points.

   (c)  Number of packages.

   (d)  Description of freight.

(e)   Weight, volume, or measurement of freight (if
      applicable to the rating of the freight).

49 C.F.R. § 373.101.  The Waybills included all of this

information.  Summary judgment on this issue is therefore

denied.

    D.   C&S's Counterclaim for Violations of the Connecticut
         Unfair Trade Practices Act

    Summary judgment is granted in favor of Grocery Haulers on

C&S's Connecticut Unfair Trade Practices Act (CUTPA)

counterclaim, Count IV of C&S's Counterclaims, because C&S does

not contest that the FAAAA preempts enforcement of state unfair

competition laws -- such as CUTPA -- through private suits.

See, e.g., In re EVIC Class Action Litig., M-21-84 (RMB), 2002

WL 1766554 (S.D.N.Y. July 31, 2002).

    E.   C&S's Counterclaim for Violation of 49 U.S.C. § 13708

    As discussed above, C&S has established that Grocery

Haulers violated 49 U.S.C. § 13708, Count V of C&S's

Counterclaims, as a matter of law, but has failed to demonstrate

that there are no genuine issues of material fact as to C&S's

actual damages.  Accordingly, Grocery Haulers' motion for

summary judgment on C&S's Section 13708 claim fails.

CONCLUSION

Grocery Haulers' April 6, 2012 motion for summary judgment is granted as to Count IV of C&S's Counterclaims only, and denied in all other respects. C&S's April 6, 2012 motion for summary judgment is denied.


SO ORDERED:

Dated:     New York, New York
           September 14, 2012

                         _____
                              DENISE COTE
                    United States District Judge